48 CCPA

**Theodore A. TE GROTENHUIS,**
Appellant,

v.

**Luther L. YAEGER, Appellee.**

Patent Appeal No. 6636.

United States Court of Customs
and Patent Appeals.

June 9, 1961.

Theodore A. TeGrotenhuis, Cleveland, Ohio, pro se.

Vincent A. Greene, Cleveland, Ohio (Frank S. Greene, McCoy, Greene & TeGrotenhuis, Cleveland, Ohio, George R. Jones, and Beale & Jones, Washington, D. C., of counsel), for appellant.

Foster York, Chicago, Ill. (John M. Diehl, Madison, Wis., Zabel, Baker, York, Jones & Dithmar, Chicago, Ill., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal by TeGrotenhuis from a decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention of the subject matter in eight of the ten counts in interference No. 88,771 to Yaeger, the senior party. Priority as to the other two counts, 8 and 9, was awarded to TeGrotenhuis. No cross appeal has been taken by Yaeger as to the latter two counts.

U. S. Patent No. 2,742,378 was issued to TeGrotenhuis on April 17, 1956 on application serial No. 302,415, filed August 2, 1952. This application was a continuation-in-part of two applications, serial No. 243,737, filed August 25, 1951, now abandoned, and serial No. 585,824, filed March 30, 1945, now Patent No. 2,-751,369.

On April 9, 1956, Yaeger filed application serial No. 576,816 as a continuation of application serial No. 273,770, filed February 27, 1952. The latter application was a continuation-in-part of

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

Yaeger's application serial No. 170,465, filed June 26, 1950.

On August 20, 1956, Yaeger added by amendment to his application serial No. 576,816 ten claims of the TeGrotenhuis patent No. 2,742,378. An interference was declared between Yaeger and TeGrotenhuis with these ten claims as the counts. Yaeger is the senior party on the basis of his February 27, 1952 application date.

The invention defined in the counts relates to certain solid "composite articles" comprising textile fibers and a polymeric resin, and to a method of making the articles. The articles are said to possess superior cohesive properties because an organosilicon compound is used as a sort of "molecular cement" between fibers and resin. In other words, each silicon compound molecule is attached by chemical bonds both to a fiber and to the resin which surrounds it. In making the articles, it is recognized that a plurality of hydroxyl groups is normally present on the surface of a textile fiber. Certain "hydroxyl-reactive" organosilicon compounds with one or more carbon-to-carbon double bonds, for example, vinyl silicon trichloride, are allowed to react with the fibers whereby the fiber hydroxyl groups, fiber-OH, are transformed to fiber siloxane groups, fiber-O-$\overset{.}{\text{S}}$i- , in which at least one free bond to each silicon atom is connected to an organic group with carbon-to-carbon unsaturation These modified fibers are then contacted with an olefinically unsaturated liquid, for example, styrene, and the liquid is polymerized to the solid state. The unsaturated groups attached to the modified fibers interpolymerize with the liquid. Thus a plurality of chains comprising a silicon atom and two or more carbon atoms bind fibers and surrounding resin together in the finished composite article.

The following counts are representative:

"1. A method of preparing composite articles which comprises bonding vinyl-silicon-oxide groups ($CH_2=CH-\overset{.}{\text{S}}i-O-$) directly to the surface of textile fibres having hydroxyl groups on the surface by contacting said fibres with a hydroxyl-reactive vinyl silicon compound having a vinyl group attached directly to silicon, thereafter contacting the said fibres with a liquid polymerizable to the solid state and comprising a styrene and polymerizing said liquid to the solid state in contact with the surface of said fibres, whereby said vinyl groups are subject to interpolymerization with polymerizable constituents of said liquid to chemically bond the in situ formed solid polymer to the surface of said textile fibres through the silicon-oxide linkage of said vinyl silicon oxide groups.

"2. A method of making fibre reinforced articles which comprises wetting, with a polymerizable olefinically-unsaturated liquid capable of being solidified to the rigid state by polymerization, textile fibres, which normally have hydroxyl groups on their surface but which are modified by having bonded to the surface thereof a vinyl siloxane coupling compound having a carbon of an olefinic group thereof attached directly to a silicon atom, said surface of said fibres having said coupling compound thereon being different from the body of said fibres, and forming an interface for interpolymerization with unsaturated groups of an olefinically-unsaturated monomeric liquid polymerizable to the solid state by means of said olefinically-unsaturated groups, and maintaining said olefinically-unsaturated liquid in contact with said fibres until it has solidified to the solid nonflowable state, the vinyl group of said vinyl siloxane coupling compound being attached through a siloxane group to said fibres, whereby said olefinic groups on the surface of said fibres are available for interaction with the

monomer when it is polymerized to the solid state."

"7. A composite article comprising an in situ polymerized solid polymer of a liquid comprising a polymerizable olefinic compound selected from the group consisting of diolefinic compounds having a chain of less than 7 aliphatic carbon atoms and polymerizable mono-olefinic compounds, textile fibres in said polymer for reinforcing the same and an interfacial coupling compound bonded to said textile fibres and chemically combined with said solid polymer, said interfacial compound being different both from the body of said fibres and the mass of said solid polymer, said interfacial compound comprising the interpolymerization product from the interpolymerization of vinyl siloxane groups on the surfaces of said fibres and of said olefinic compound, said vinyl groups being attached directly to silicon and being bonded to said fibres through silicon-oxygen linkages."

"10. A liquid-permeable mass of substantially dry flexible textile fibres suitable for soaking up a polymerizable liquid, said fibres being of a material which normally carries hydroxyl groups on the surface thereof, the surfaces of said fibres being modified by having groups of a vinyl siloxane attached thereto for subsequent reaction with said polymerizable liquid during the polymerization thereof, the said vinyl groups being attached through said siloxane groups to said surface, the fibres having said vinyl groups attached thereto being wettable by said polymerizable liquid, whereby said mass is capable of soaking up polymerization liquid to bond said fibres together upon the polymerization thereof and whereby a molecular bond between the surface of the fibres and the resultant polymer may be had by interaction of said vinyl groups and said polymerizable liquid during said polymerization."

No testimony was taken by either party. Yaeger alleged in his preliminary statement a reduction to practice of the invention on March 24, 1950. TeGrotenhuis has stipulated that this allegation is true and that Yaeger's application serial No. 170,465, now abandoned, discloses the invention of the counts. TeGrotenhuis has alleged a constructive reduction to practice on March 30, 1945, the filing date of his parent application serial No. 585,824.

The sole issue before this court is whether TeGrotenhuis is entitled to the benefit of the March 30, 1945 filing date of his parent application serial No. 585,-824 for the purpose of priority judgment as to each count in issue. The same issue as to all the counts was before the board and it decided that TeGrotenhuis was not entitled to the benefit of that date except as to counts 8 and 9. Accordingly, the board awarded priority as to these counts to TeGrotenhuis and priority as to the other eight counts, those in issue here, to Yaeger.

In reaching its conclusion, the board considered that the composite articles and the method of making them involve the broad concept of chemically bonding together sequentially three components. The board stated:

"Component one is a fabric material defined usually in the counts as 'textile fibers having hydroxyl groups on the surface' but otherwise in equivalent wording. This is descriptive of most fabrics, even glass fabric or fibers * * *. * * * There is no dispute about component one.

"There is also no dispute about component three defined in the counts in varying degrees of breadth from 'comprising a styrene' * * * to merely 'a polymerizable liquid' in count 10. As to component three all of the counts read on styrene which is well known to be polymerizable and with some compounds to be copolymerizable. * * *"

The board found that the "controversy concerns component two" which in the

process is the organosilicon compound or "molecular cement" which links together fibers and resin, first by attaching itself to the fibers through the fiber-OH groups and later by interpolymerizing with the styrene as the latter forms the resin *in situ*. Component two is recited in the counts either as a separate reactant or as the group which is attached to the fibers or in both ways. For example, in count 1, the reactant is "a hydroxyl-reactive vinyl silicon compound having a vinyl group attached directly to silicon" and the fiber groups are "vinyl-silicon-oxide groups $(CH_2=CH-Si-O-)$." In count 3, the reactant is not recited and the fiber groups are "vinyl groups with a carbon atom of the carbon-to-carbon double bond thereof chemically bonded to the surfaces thereof [i. e., fiber surfaces] directly through a silicon-oxygen linkage."

In order to understand this controversy, which is whether there is a sufficient disclosure of component two in the Te-Grotenhuis 1945 parent application serial No. 585,824 to support the counts in issue, it is necessary to consider portions of that application. For convenience, we will hereinafter refer to patent No. 2,751,369 into which that application matured and which differs therefrom only in the omission of certain nonpertinent portions. Both patent and application as filed relate to incorporation of both pigments and fibrous materials into various compositions. Column 10 of that patent starting at line 3 reads in pertinent part as follows:

"Preparation of Coated Fabrics

"The treatment of fibrous materials to be coated with films or layers of rubbery or resinous compositions represents another aspect of the present invention.

"It is found that fibrous materials, including woven fabrics of cotton, * * *, when subjected for only a short interval to vapor of *an organic silicon halide, such as one within the general formula above set forth,* may be readily coated with a film of resinous material * * *. * * *

"When the organic group in the silicon halide is unsaturated, and particularly when it contains conjugated double bonds, a bond may be obtained between unsaturated materials either by polymerization mechanism or through the agency of chemical reagents such as sulfur. Thus, for example, it is found that cross-woven or tire cord fabric of cotton, rayon or the like, treated by exposing it for as little as two or three seconds to a vapor of a hydrocarbon-substituted silicon halide, such for example as a mixture of methyl silicon halides, and subsequently treated with a compounded rubber cement or an aqueous dispersion of compounded rubber latex, *forms a film which interlaces with the fibrous material and has a strong tendency for adhesion.* When a solution in volatile organic solvent or in monomeric polymerizable material of a resinous polymer, such for instance *as a solution of polystyrene,* * *, is applied to the surface of the treated fabric and the solvent evaporated or caused to polymerize in situ, a more impermeable coating may be had on the fabric with a minimum film thickness. By substituting *a butadienyl silicon halide* (which may for example be made by a Grignard synthesis from silicon tetrachloride and chloroprene) *or other silicon halide having an unsaturated polymerizable group* for the methyl silicon halide above, a direct chemical union between the fibrous material and the polymerizable constituents may be obtained when the thus treated fabric is coated with either a partial polymer of rubbery or resin-forming materials, such as one or more of those hereinbefore set forth, and the polymerization continued by heating or with the aid of chemical reagents. * * * [Emphasis ours]."

With regard to *this particular portion* of the parent disclosure, it appears the board found: (1) a teaching therein of the generic concept of preparing composite articles of the type recited in the counts at issue; (2) a teaching therein of the specific components one and three recited in those counts; (3) that "a butadienyl silicon halide" as a specific component two does not satisfy the terms of those counts; and (4) that the expression "other silicon halide having an unsaturated polymerizable group" is not sufficiently specific as a teaching of component two. There appears to be no substantial controversy as to findings (1) and (2). Appellant disagrees strenuously while, as might be expected, appellee agrees equally strenuously with finding (3). Because of our view of the entire controversy, we find it unnecessary to resolve that particular issue. With regard to finding (4) as to component two, the board stated:

"* * * TeGrotenhuis relies upon piecing together portions of the earlier disclosure to satisfy the terms of the counts."

Before we discuss these other "portions of the earlier disclosure," it is well to note that appellee has stated in its brief:

"The Board thus refused to piece together portions of the TeGrotenhuis 1945 application to meet the disclosure of the counts under the circumstances of this case."

We do not accept that as a fair statement of the board's position. Rather, the board found that the reference in column 10 of the patent, supra, to "an organic silicon halide, such as one within the general formula above set forth" includes "other silicon halides having an unsaturated polymerizable group," also in column 10, that both of these references relate back to disclosures of organic silicon halides, both generic and specific in columns 1 and 3 of the same patent, and that to this extent, at least, TeGrotenhuis was justified in "piecing together portions of the earlier disclosure to satisfy the terms of the counts," but that

such "piecing together" did not produce a disclosure of component two which would support the counts.

The pertinent portions of columns 1 and 3 of the patent are:

"* * * I prefer an organic silicon halide having the general formula $R_aSiX(4_{-a})$, where X is selected from halogen groups, preferably chlorine, $a$ is 1 to 3, inclusive, and each of the groups R is selected from organic groups such for example as short or long-chain saturated or unsaturated groups, such as alkyl, alkylenyl, dienyl, haloalkylenyl, aryloxyaryl, alkoxyaryl, alkoxyaliphatic, aryloxyaliphatic, haloalkylene, aryl, aryloxy, alkoxy or mixtures thereof. Compounds selected from the above, having at least one of the organic groups bonded to silicon by a carbon-to-silicon bond, are much more stable and are accordingly preferred [column 1 starting at line 65].

"Examples of suitable organo-substituted silicon halides for the present invention are: the alkyl-substituted silicon chlorides such as mono-, di- and trimethyl, ethyl, propyl, butyl, and lauryl silicon chlorides, etc.; the alkylenyl silicon halides such as *mono-, di-* and *trivinyl,* allyl, butenyl and dodecylenyl *silicon halides,* etc. having two to twenty carbon atoms in at least one organic group; the alkylenyl alkyl silicon chlorides such as allyl dimethyl silicon chloride, diallyl methyl silicon chloride, allyl methyl silicon dichloride, *vinyl allyl methyl silicon chloride,* diallyl methyl silicon fluoride and allyl dimethyl silicon bromide, etc., having at least one halogen and at least one unsaturated group of two to twenty or more carbon atoms attached to silicon; the aryloxy or alkoxy silicon halides such as ethoxy silicon chloride and ethoxy diethyl silicon chloride; the alkoxy aliphatic-, alkyleneoxy aliphatic-, aryloxy aliphatic-, aryloxyaryl- and aliphatic- oxyaryl silicon

halides, such as butoxyethyl dimethyl silicon chloride, ethoxymethyl dimethyl silicon chloride, allyloxyethyl dimethyl silicon chloride, allyloxylauryl silicon trichloride, allyloxyphenyl dimethyl silicon chloride and phenoxyphenyl methyl silicon dichloride, etc.; the halogen alkylenyl or haloalkyl silicon halides including chloroethylenyl dimethyl silicon chloride (chlorvinyl dimethyl silicon chloride), chlorethyl dimethyl silicon chloride and di(chlorallyl)-methyl silicon chloride, etc. [Emphasis ours].

"While silicon halides having only an alkoxy and/or an aryloxy group linked to silicon give some desirable effects, especially in pigment preparation, etc., the preferred compounds have at least one group with a carbon atom bonded directly to silicon [column 3 starting at line 56]."

After expressing the opinion that this listing "amounts to a bare invitation to experiment at length with all known organo silicon halides until the ones workable as a component two are discovered," the board stated:

"Of course if all compounds within the listing were practically operable for the purpose of component two then it could not be denied that there would be specific disclosure of a workable vinyl silicon halide, but TeGrotenhuis himself furnished cogent evidence that many of them do not work and that even among the vinyl siloxanes many do not copolymerize, that is, act as a component two, and further as to any particular one it can only be determined empirically whether it will work or not. This appears from the affidavits of experts Urbanic, Gruber and Swart

noted previously as having been filed by TeGrotenhuis in TA 8–2–52.[1] "

After discussing the cited affidavits, the board stated further:

" * * * Hence any inclusion of vinyl siloxanes by general listing or general formulation as a specific teaching is devoid of weight as inconsistent with the affidavits which definitely do teach that in each instance workability must be determined empirically. In other words as regards the general listing as of the time of the earlier filing TeGrotenhuis placed the burden of discovering the present invention upon the public where it does not belong."

Thus the board's basic position appears to be that there is a "specific disclosure of a workable vinyl silicon halide" in column 3 of the TeGrotenhuis patent, but that such disclosure "as a specific teaching is devoid of weight" because there has been no "expression of specific preference" for the vinyl silicon halides, because the vinyl silicon halides "are buried among thousands of other silicon halides,"[2] and because there is evidence in the record supplied by TeGrotenhuis himself that many of the other silicon halides "do not work" and that "workability must be determined empirically." It is this basic position which we will discuss.

First we will consider the listing of "suitable organo-substituted silicon halides" in column 3 of the TeGrotenhuis patent. In accord with column 10 of that patent, the organic group in the silicon halide must be unsaturated. There are four types of unsaturated compounds listed in column 3. These are alkylenyl silicon halides, alkylenyl alkyl silicon chlorides, alkyleneoxy aliphatic silicon halides, and halogen alkylenyl silicon

1. TA 8–2–52 is the board's symbol for the TeGrotenhuis application serial No. 302,415, filed August 2, 1952.

2. In reply to TeGrotenhuis' petition for reconsideration by the board, Yaeger estimated that the unsaturated silicon halides recited in the list, column 3 of the TeGrotenhuis patent, encompassed over 850 billion specific organic compounds. In its reconsideration, the board adopted Yaeger's reply, including presumably this estimate, in lieu of further discussion.

halides. After each of these generic recitations and following the words "such as" or "including," two to six specific organosilicon halides are recited. Each of the seventeen specific compounds is within the scope of the generic name which precedes it. Although we agree that many saturated and unsaturated organosilicon halides are encompassed by the entire list, only seventeen *specific* unsaturated silicon halides are recited and we do not believe that the four specific vinyl silicon halides are "buried" among these seventeen. Moreover, we believe by reciting these seventeen specific compounds, TeGrotenhuis has expressed a distinct preference for them. Further, we do not believe that choosing suitable examples of component two from among the broad listing of compounds in column 3 of the patent places an undue burden upon the public since, as this court said in Prutton v. Fuller et al., 230 F.2d 459, 463, 43 CCPA 831, 836; "* * * anyone attempting to carry out the disclosure of an application would logically begin with the preferred examples given."

Second, although "workability" of every specific compound alleged to be suitable as a component in a process may be an appropriate subject of inquiry under some circumstances in interference proceedings, we do not believe such inquiry is pertinent here where four of seventeen preferred alternative components are admitted to be workable while, according to the board, the other thirteen are not within the terms of the counts. A similar situation arose in Prahl et al. v. Redman, 117 F.2d 1018, 1022, 28 CCPA 937, 942. In that case, the appellee had invoked an interference by copying claims from appellants' patent. The claims recited use of a particular catalyst in an old chemical process. Appellee's application disclosed specific examples of certain other catalysts for the same process. Appellants moved to dissolve the interference on the ground that these other catalysts were inoperative and attempted to offer affidavits and testimony to show inopera-

tiveness. Eventually the matter reached the Commissioner by petition. He stated:

"During the interlocutory period petitioners [Prahl et al.] moved to take testimony * * * that the specific catalysts given as examples by Redman [appellee] in his application are inoperative in the process covered by the claims then in issue, four of which claims are existing counts 1 to 4. After the interference had been re-formed by adding counts 5 to 8 and petitioners had been placed under the order to show cause they brought a similar motion as to these counts. In both of these motions petitioners admitted that the particular catalysts which they seek to prove inoperative by testimony are 'outside the issue of the interference.'

"Both the primary examiner and the examiner of interferences have correctly pointed out that testimony on the operativeness of such catalysts would be irrelevant to the right of Redman to make the claims in issue. The refusal by the examiner of interferences to permit petitioners to take testimony was therefore proper."

On appeal, this court stated as to this particular issue:

"We are convinced, as were the Patent Office tribunals, that appellants were not entitled to take testimony upon the subject of inoperativeness, for the reasons set forth by said tribunals."

Nevertheless, we are moved to examine the basis of the board's assertion that many of the examples of component two in column 3 do not work and that workability can only be determined empirically. The board has relied on certain record affidavits in support of its position. We do not believe these affidavits support that position. The affidavits were submitted by TeGrotenhuis during *ex parte* prosecution of his application serial No. 302,415 which matured into the patent here in interference, and were

intended to dispose of Johannson patent No. 2,436,304 which had been cited as a reference with regard to certain claims to fibers with vinyl groups attached thereto through silicon-oxygen linkages. Claims reciting the composite fiber-resin articles of the counts at bar were not then in issue. Johannson discloses fibers with allyl and methallyl groups attached thereto through silicon-oxygen linkages. The examiner's position appears to have been that the allyl and methallyl groups attached to fibers as disclosed in the reference patent are polymerizable, that any difference as compared with another alkenyl group such as vinyl is one of degree only, and that substitution of vinyl for allyl is well within the skill of the average chemist. TeGrotenhuis answered this in part as follows:

"* * * it would be very helpful as well as beneficial, if the Examiner would please explain how one could at the effective date of the invention have predicted that vinyl silicon compounds will polymerize in a manner superior to allyl silicon compounds, particularly when attached to a rigid surface. As shown by the accompanying affidavits, these experts as well as applicant know of no basis upon which anyone could make such a prediction, as the Examiner has so readily done. * *"

The experts referred to by TeGrotenhuis were Urbanic, Gruber and Swart.

The affidavit of Urbanic stated in part:

"* * * It is *now* definitely recognized that the vinyl group * * * of the vinyl siloxane group * * * is a highly reactive group capable of interpolymerization or interaction with materials which interpolymerize or react with double bonds and that this group is more reactive when attached to the fiber or solid than the alkenyl siloxanes, such as allyl and methallyl siloxanes. * *

* * * * * *

"* * * The allyl siloxanes while capable of some interpolymerization are not as effective as are the vinyl siloxanes in accomplishing the purpose of applicant and, of course, all of the other thousands of compounds within the preferred group aryl and alkyl of the patent to Johannson are completely ineffective in accomplishing applicant's result.

"Affiant knows of no rule by which one even being aware of allysiloxane and the fact that it has a small amount of ability to copolymerize, would be able to state that a vinylsiloxane or a vinylsiloxane *attached to glass or a base member* could polymerize or copolymerize at all. * * [Emphasis ours]."

The affidavit of Gruber stated in part:

"* * * Affiant knows of no means whereby one could give an opinion, *prior to the invention described and claimed in the above-designated application,* that a vinyl siloxane or vinyl silicon compound *adhered to the surface of a fiber or on the surface of any material* would have the ability to form a copolymer with any material, even though allyl or alkenyl silicon compounds 'such as allyl, methallyl, etc.' have been already shown to have a slight ability to copolymerize (which was not even believed to have been known at the time of the invention of the above-designated application). * * * [Emphasis ours]."

The affidavit of Swart stated in part:

"* * * The effect of the silicon atom and the position of the silicon atom with respect to an olefinic group or double-bonded carbon *was not in any way to affiant's knowledge known prior to the invention described in the above-designated application.* The effect of adhering a vinyl silicon group to a rigid surface through a silicon atom on its ability to copolymerize could not be predicted by any method known to affiant. Affiant also knows of no way to predict the effect of even a change in the positions of the olefine group relative to the surface on activity

or deactivity. Affiant finds no teaching in the Johannson patent 2,436,-304 having any bearing on these effects.

\* \* \* \* \* \*

" \* \* \* The effect of the position of the silicon atom on the activity of the olefine group was not to affiant's knowledge known *at the time of* the invention of the above-designated application. \* \* \* [Emphasis ours]."

The total impression which we receive from these affidavits is that *prior* to the invention date in question, it was not known and could not have been predicted that vinyl groups *attached to fibers* through silicon-oxygen linkages were superior for the purpose of TeGrotenhuis to allyl groups *so attached*. It is true that the affiants do cite examples of vinyl and allyl compounds which do not polymerize or copolymerize but none of these are silicon compounds. We find no evidence in the affidavits that any of the specific unsaturated compounds recited in column 3 of the TeGrotenhuis patent would not be suitable for making the invention recited in the appealed counts. It may be that vinyl silicon compounds are better for the present purpose of TeGrotenhuis than allyl silicon compounds but there is no indication that the allyl compounds would not be workable. The only purpose of the affidavits was to convince the examiner that *his* prediction of the equivalence as to polymerizability of allyl and vinyl groups attached to fibers through silicon-oxygen linkages was not proper. Thereafter, the examiner allowed the claims in question.

For the foregoing reasons, we believe that the disclosure of the TeGrotenhuis parent application serial No. 585,824, filed March 30, 1945, is such that TeGrotenhuis is entitled to the benefit of that date for the purpose of priority judgment as to the eight counts at bar. Accordingly, the decision of the board is *reversed* and priority as to counts 1 through 7 and 10 is awarded to TeGrotenhuis. Appellant has moved for leave to file a reply brief. Sufficient need therefor has not been shown and the motion is denied.

Reversed.